Argued and submitted November 16, 1981, affirmed May 12, 1982

# BALL,
*Appellant,*

*v.*

# DAY et al,
*Respondents.*

## (No. 80-38239, CA A20522)

644 P2d 649

Morton A. Winkel, Portland, argued the cause and filed the briefs for appellant.

John C. Pinkstaff, Newberg, argued the cause for respondents. With him on the brief was Jack C. Nulsen, Jr., Newberg.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiff, the purchaser of a business and assignee of a lease on the premises where the business is located, appeals from an adverse ruling on her complaint for a declaratory judgment. Her predecessors in interest, Brays, bought and leased from defendants. Plaintiff sought declaratory relief to establish the obligation of defendants, as landlords, to make repairs and replacements to the leased building and to cease competing with plaintiff. The trial court found that defendants had no obligation other than to repair a door hinge and that plaintiff has no rights under a covenant not to compete, because that covenant was with Brays, who had not assigned it to plaintiff.

In September, 1977, Brays bought equipment and goodwill constituting the "Dip-N-Donut" business and leased a building from defendants. Defendants agreed not to compete with Brays. Later, defendants encouraged Brays to install a grill to expand the business. Brays installed the grill and a hood fan. The grill generated heat beyond the capacity of the existing air-conditioning system. In an unsuccessful attempt to solve the problem, Brays installed an exhaust fan in the roof. The hot water heater was also inadequate to handle the expanded business, and defendants and Brays shared the cost of a larger heater.

In September, 1979, Brays sold the business and assigned the lease to plaintiff. Defendants' consent to this transaction was necessary. Prior to the assignment, Brays and defendants entered into a modification of their original contract whereby Brays were responsible for "nominal maintenance and repair of ordinary wear and tear," to air conditioning and heating systems and all exterior doors and hardware now located at the leased property. Defendants agreed to provide "any required extraordinary repairs or replacement" of the same equipment.

After plaintiff took over the business, she discovered that the heating, air conditioning and hot water heater were inadequate to meet the demands of the expanded business, that the fan and front door needed repairs, that the roof leaked where the fan had been installed and that defendants were operating a restaurant next door in apparent violation of the covenant not to compete.

■ ■ Five of plaintiff's assignments of error deal with a landlord's obligation to make repairs. As a general rule, a commercial landlord has no duty to make repairs, *McWilliam v. Phillips Petroleum, Inc.,* 269 Or 526, 528, 525 P2d 1011 (1974), and a decision by the tenant to alter the leased premises cannot in itself impose a duty upon the landlord to make repairs compatible with the tenant's alterations. The landlord may assume such a duty under the lease agreement, and defendant contends he did so when he agreed to provide "extraordinary repairs or replacement" of air conditioning and heating systems and exterior doors. This language does not impose a duty upon the landlord to replace heating or air conditioning units with larger capacity systems in order to keep up with new uses to which a tenant puts leased property, even if the new use is encouraged by the landlord. Under the modified lease agreement, that is the tenant's obligation. That the language of the modification agreement refers to repair of equipment "now located" on the premises strengthens this conclusion. The provision refers to repairs and replacement of defective equipment.

■ Similarly, the landlord had no obligation to replace tenant's hot water heater to keep pace with increased business. Plaintiff cites no authority to support her contention that a landlord must supply a hot water heater "which will accommodate the tenant's needs."

■ ■ As for the fan, the trial court found that it was not part of the heating system and that it was not included in defendants' agreement in the original lease to "maintain the exterior and roof of said building in good repair * * *." We agree with this conclusion. Whether the fan was intended to be part of the air-conditioning system is a closer question. The fan was in place at the time of the modification agreement, which referred to air-conditioning systems "now located" on the property. Given that plaintiff now argues only that the fan was part of the roof, we agree with the trial court that the fan was not thought of as part of the air-conditioning system. The fan was installed for exhaust purposes after the grill was put in, and not for purposes of heating and cooling, which was done by a heat pump. We also agree with the trial court that the broken

fan and the roof leaks, which resulted from its faulty installation, are the responsibility of the tenant and not the landlord. It cannot be fairly inferred from defendants' agreement to repair the roof that they contemplated assuming a duty to repair conditions caused by a tenant's alterations.

■ The trial court also declared that the covenant not to compete was personal. The original agreement read:

"That as a part of the consideration of this sale, it is agreed that Sellers will not compete with Buyers in the doughnut shop business, directly or indirectly, as employers, employees, or otherwise, within a radius of five miles from said business location for a period of five years from this date; and it is further agreed that in the event Buyers should discontinue the operation of said business, they will not compete with Sellers in the doughnut shop business, directly or indirectly, as employers, employees, or otherwise, within a radius of five miles from said business location, for a period of five years from this date."

Defendants agreed not to compete *with the buyers* (defined earlier in the contract as Brays), but not to abstain from selling doughnuts. This distinguishes the covenant not to compete addressed in *Coker & Bellamy v. Richey,* 104 Or 14, 202 P 551, 204 P 945, 204 P 947, 22 ALR 744 (1921), cited by plaintiff. There, the seller of a business agreed " 'not to enter the piano or music business in any way, shape or form, actively, for himself or otherwise, in La Grande, Union County, Oregon.' " 104 Or at 19. The court stated that *"such a covenant* is assignable with a subsequent sale of the business and goodwill by the original vendee and * * * will pass to the new purchaser as an incident of the latter sale." 104 Or at 27 (emphasis added).[1]

The personal nature of the covenant given Brays is also shown by the convenant's second clause, under which Brays promised not to compete with defendants ·in the event Brays should "discontinue the operation of said business." This would have been a useless promise to extract if the parties did not contemplate that the defendants would be entitled to re-enter the doughnut business upon Brays' leaving it. Because the language of the covenant involved

---

[1] Brays' sale of the business to plaintiff included good will, the assumed business name and leasehold rights.

here is personal in nature, unlike the covenant involved in *Coker & Bellamy v. Richey, supra,* it was not assignable. The trial court correctly declared that plaintiff cannot enforce the covenant.

Affirmed.